# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### 3:22-cv-17-RJC
### (3:16-cr-145-RJC-DCK-2)

ZAVIAN MUNIZE JORDAN,    )
    )
       Petitioner,    )
    )
vs.    )        **ORDER**
    )
UNITED STATES OF AMERICA,    )
    )
       Respondent.    )
_____)

**THIS MATTER** is before the Court on Petitioner's Motion to Vacate, Set Aside or Correct

Sentence under 28 U.S.C. § 2255 [Doc. 1], on the Respondent's Motion to Dismiss [Doc. 4], and

on Petitioner's Motion to Amend [Doc. 9].

## I.     BACKGROUND

Law enforcement was investigating heroin and cocaine trafficking in Charlotte in 2016.

[3:16-cr-145 ("CR") 148 at 75, 271]. A confidential source ("CS") was arrested on April 21, 2016

in possession of 20 grams of heroin, and officers found firearms, additional heroin, and U.S.

currency in his residence. [Id. at 76, 780]. The CS agreed to cooperate with officers, provided

information about his supplier, "Zee," who drove a white Dodge Ram 1500 truck, and from whom

the CS purchased a half-kilo of heroin every seven to 10 days for the past year-and-a-half. [Doc.

75 at 8-10 (Suppression Hearing Transcript)]. The CS placed a recorded phone call to Zee on April

24, 2016. [Id. at 81-83; Doc. 1-3 (recorded phone call); see also Doc. 1-5 (transcription)]. The

recording reflects that the following transpired in relevant part:

    [CS]        … [H]ey, um … well my shit got damn boy. I only got a select few
            over here that I can god damn do right now, boy. Goddamn my shit
            looking slim. I know we got a couple of singles over there but uh …

| | |
|---|---|
| | when we gonna get back right boy? Uh … I'm getting a little scary over here. |
| JORDAN | Yeah … uh… soon. Well uh … we going to be good. |
| [CS] | Yeah I'm gonna, I'mma, I'mma gonna holler at Little [unintelligible]. BG has got something over there. I'm gonna holler at him to probable, you know, get a little … probably a couple of zips you know what I'm saying but … I'm trying to do the same thing on the [unintelligible]. I mean. I don't know how that shit is … I'm not trying to stretch out too far not trying to get [unintelligible]. Know what I'm saying? They all in my business and shit. You know what I'm saying? |
| JORDAN | Just hold up before you do that. |
| [CS] | I mean, you think it's gonna be this week? |
| JORDAN | Yeah. |
| [CS] | Ok. Ok. |
| JORDAN | Something like that. I just ain't wanna talk… you know what I'm saying? |
| [CS] | Say no more, say no more, say no more. We good. We good. You know how I get when I get low man, god damn. |
| JORDAN | Yeah man. I … You know I gotta … god damn. [Unintelligible] keep that under wraps though…. You know what I mean? |
| [CS] | I got you. Say no more, say no more. We will see about that…. I'm fixing to god damn stretch out, and do what I do. |
| JORDAN | Don't. Don't panic. |
| [CS] | Alright, alright. Ok, ok say no more. Feel better now. |

[Docs. 1- 3, 1-5].

The following day, April 25, officers obtained a search warrant to track the location of the cell phone to which the CS had placed the recorded phone call. [Id.; Doc. 1-6 (Warrant Application)]. The supporting Affidavit includes the following information:

2

In early April of 2016, [the CS] was identified as a Charlotte, NC based multi-ounce heroin source of supply. Based on an ongoing DEA investigation, on April 21, 2016, [the CS] was arrested in Charlotte, NC after being found to be in possession of approximately 22 ounces of heroin, 3 guns, and drug proceeds.

During his post-Mirandized statements, [the CS] provided officials with information regarding his primary source of heroin supply who was also based in Charlotte, NC. According to [the CS], for the past 15 months, he had been purchasing approximately ½ kilogram of heroin every 6 to 10 days from a subject he knew only as "ZEE." [The CS] went on to tell law enforcement officials what "ZEE" looked like, what vehicle "ZEE" typically drove (make, model and color only) and how transactions between [the CS] and "ZEE" typically took place.

[The CS] also authorized law enforcement officials to conduct consensual searches of the cellular telephones that were in his possession at the time of his arrest. In one of [the CS's] phones, telephone number 980-406-1700 (SUBJECT TELEPHONE) was saved in the contacts of the phone as "ZEE" and [the CS] confirmed that it was the telephone number for the subject which [the CS] would contact when he needed to purchase additional heroin.

On April 24, 2016, a consensually monitored and recorded telephone call was made by [the CS] to "ZEE" at [the above number]. **During the recorded conversation, [the CS] told "ZEE" that he was in need of some additional heroin and wanted to know if "ZEE" would be available to provide approximately ½ kilogram of heroin to [the CS] the following day (April 25, 2016). "ZEE" responded that at that time, he only had a couple of ounces of heroin available to sell to [the CS] but that if [the CS] was willing to wait a few days, "ZEE" expected a shipment of heroin to arrive. Once "ZEE" had received his heroin shipment, "ZEE" could provide [the CS] with the ½ kilogram of heroin which he had requested. "ZEE" then went on to tell [the CS] that he would call [the CS] as soon as the shipment of heroin arrived and he ("ZEE") was ready to complete the drug transaction**.

[Doc. 1-6 at 9-10] (emphasis added; paragraph numbers omitted).

The CS cooperated with law enforcement between April 21 and 24. At some point between April 24 and May 11, the CS stopped being in regular contact with law enforcement; officers felt that he was no longer being a "full cooperator" and that he was not being "100 percent honest" with law enforcement, he stopped returning their phone calls, and he eventually dropped the phone through which law enforcement had contacted him. [Doc. 75 at 22-23].

James Billings, a Drug Enforcement Administration ("DEA") special agent, drove to the

3

area provided by the cell phone company on the morning of April 26, 2016. He located, within a two-block radius of the latitude/longitude coordinates provided by the cell phone company, a white 2004 Dodge Ram 1500 pickup truck matching the description that the CS had provided, parked in the driveway of a home on Cullingford Lane that was registered to Petitioner. [Doc. 1-7 at 7-8]. Officers then submitted a warrant application to place a GPS tracker on the white truck in which they reiterated the information from the CS that was contained in the first warrant, plus Agent Billings' observations on April 26. [CR Doc. 148 at 89; see Doc. 1-7 at 7-8]. Officers were granted a warrant and they began following Petitioner's movements. [CR Doc. 148 at 89-90].

On May 11, 2016, officers including Agent Billings and Clint Bridges, a DEA task force officer, set up a surveillance team on Petitioner's Cullingford Lane residence. [Id. at 93, 135-36]. Officers saw Petitioner's vehicle stop at a residence on Lyles Court, travel to a parking garage in downtown Charlotte for about an hour, then travel to a residence on Ravencroft Avenue. Petitioner went inside the Ravencroft home for 20 to 30 minutes, he exited with a white bag containing an item about size of a shoebox which he left in his truck, he retrieved a smaller package which he took into the house, and then he returned to the vehicle empty-handed a few minutes later. [Id. at 94, 136-41].

Detective Christopher Newman, a Charlotte-Mecklenburg Police Department narcotics unit and canine officer, followed Petitioner's vehicle when it left the Ravencroft residence and conducted a traffic stop. [Id. at 32-34]. When Detective Newman patted Petitioner down for weapons, he saw a small tied-off glove in Petitioner's pocket. [Id. at 36-37]. After backup arrived, Detective Newman deployed his drug dog, which gave a positive indication at Petitioner's driver's door; Petitioner admitted that he had some cocaine on him. [Id. at 38]. Detective Newman searched Petitioner and his vehicle and recovered: the packet of cocaine an approximately $2,000 from

4

Petitioner's pocket; a gun under the vehicle's center console; a white shoe bag containing $26,000 in U.S. currency; a small electronic device to detect electronic surveillance around the vehicle; and a total of six cell phones, one of which matched the number that the CS used in the recorded phone call. [Id. at 42-44, 47-48].

Petitioner was arrested and taken to the police station where he was interviewed in a recorded room by Agent Billings and Officer Bridges.[1] Petitioner was warned of his Miranda rights, and Petitioner indicated that he understood. [CR Ex. 10 at 15:42:26-15:43:14]. Petitioner admitted that: he had dropped off about nine ounces of cocaine at the Ravencroft residence and received about $26,000 in cash; he charges $1,200 per ounce of cocaine; and he had been dealing with the individual at Ravencroft on and off for about a year-and-a-half. Petitioner explained that the cash he received at Ravencroft did not correspond to the price for nine ounces of cocaine that he left there because that person owed him money. [Id. at 15:52:45].

Almost 16 minutes after the interview began, Petitioner said "I thought you said I can get a lawyer to talk to me." [Id. at 15:59:18-15:59-19]. Agent Billings responded "You can, but once, once you do that, once today is gone, because we can't get you a lawyer right now, there's none in the hallway waiting for you, but once you get a lawyer then we're done, and I can't help you at all, ok? But that is your absolute choice, ok?" [Id. at 15:59:20-15:59:33]. Petitioner did not request counsel and continued to answer the officers' questions. The interview continued and Petitioner explained, *inter alia*, that he uses the Lyles residence, his deceased grandmother's home, to package drugs; he had approximately $30,000 at his Cullingford home from the sale of a trucking business, a truck, and a trailer; and there is a firearm at the Cullingford home that belongs to his girlfriend. [Id. at 16:00:40-16:10:05].

---

[1] The recorded interview was Government Exhibit 10 at trial.

On May 11, 2016, Agent Billings submitted an Application to search Lyles, Ravencroft, and Cullingford residences. [Doc. 1-8 at 4-5]. The Affidavit reiterates the information from the prior Applications, as well as evidence that was gained on May 11 including the officers' observations, evidence seized during the traffic stop, and Petitioner's admissions during the custodial interview as follows:

> After locating the suspected drugs, guns, and other contraband, officers arrested JORDAN, who is a convicted felon, and transported him to a CMPD division office. SA Billings and a DEA task force officer then interviewed JORDAN after advising him of his *Miranda* rights. JORDAN indicated that he understood his rights and stated the following:
>
> a.      With respect to TARGET PROPERTY 3 (the 2909 Ravencroft), JORDAN admitted that earlier on May 11 he delivered 9 ounces of cocaine at TARGET PROPERTY 3 to a subject []. JORDAN stated that [the individual] gave him (JORDAN) a bag containing approximately $26,000 in exchange for the 9 ounces of cocaine and as a payment for previous drug debt. JORDAN's admissions were consistent with what officers observed at TARGET PROPERTY 3 earlier that day, when JORDAN exited the residence holding a white plastic bag and returned with a smaller item that he left inside. JORDAN stated that he had obtained the cocaine earlier in the day from a subject [] at a parking garage in downtown Charlotte, which is also consistent with law enforcement's observations during the surveillance earlier in the day.
>
> b.      With respect to TARGET PROPERTY 2 (501 Lyles Court), JORDAN explained that after obtaining the cocaine from [the individual at the parking garage], he (JORDAN) went to TARGET PROPERTY 2, where he weighed and repackaged the drugs for delivery to [the individual at Ravencroft]. When asked if there were drugs located at TARGET PROPERTY 2, JORDAN denied that there were drugs but admitted that TARGET PROPERTY 2 contained scales and drug packaging materials. JORDAN stated that TARGET PROPERTY 2 had belonged to his now deceased grandmother and that he had a key to access the residence. JORDAN advised that there was no one else located at TARGET PROPERTY 2.
>
> c.      With respect to TARGET PROPERTY 1 (8435 Cullingford), JORDAN stated that he lived there along with his girlfriend and three minor children. JORDAN admitted that there were firearms inside TARGET PROPERTY 1 but claimed that they did not belong to him. JORDAN also admitted that there was approximately $30,000 in the residence but claimed

the cash was profits from the sale of a trucking business and not drug proceeds. JORDAN also denied that there were any drugs inside the residence.

[Doc. 1-8 at 10-13] (paragraph numbers omitted).

Officers were granted all three warrants and they recovered evidence from the Lyles residence including: five bags of China white heroin totaling approximately 275 grams; a Glock next to digital scales; drug packaging paraphernalia; ammunition and magazines. [CR Doc. 148 at 95-99, 104-06]. Evidence recovered from the Ravencroft residence included: 753.81 grams of cocaine; marijuana and methamphetamine; and a loaded pistol. [Id. at 108-10, 173-77]. Evidence recovered from the Cullingford residence included: a stolen firearm; a machinegun-style firearm; a bulletproof vest; a high-capacity drum magazine; and $24,200 in U.S. currency.[2] [Id. at 276-79, 283].

Petitioner was charged with: conspiracy to possess with intent to distribute one kilogram or more of heroin and 500 grams or more of cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1) (Count One); possession with intent to distribute 100 grams or more of heroin in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B) (Count Five); distribution and possession with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) (Count Six); possession of a firearm in furtherance of a drug trafficking crime, i.e., Counts One and Six, in violation of 18 U.S.C. § 924(c)(1)(A) (Counts Eight and Nine); and possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1) (Count Ten). [3:16-cv-145 ("CR") Doc. 68].

Petitioner moved to suppress all of the evidence obtained as a direct and indirect result of the search, seizure, and arrest of Petitioner on May 11 including evidence seized from his person and vehicle, his confessions, and all evidence gathered from the three residences. He argued *inter*

---

[2] A firearm in Petitioner's girlfriend's name was not confiscated. [CR Doc. 148 at 283].

7

*alia* that the traffic stop was pretextual an overly prolonged, the CS was no longer cooperating after April 24, and the search warrants were invalid. The Court denied the Motion following an evidentiary hearing. [CR Doc. 75]. The Court specifically found that the length of the traffic stop was reasonable, the officers' constructive knowledge at the time of the stop was "overwhelming," and the information supporting the traffic stop was not stale. [Id. at 111-14].

The matter proceeded to a jury trial. The defense theory of the case was of insufficient evidence, *i.e.*, that the Government relied on people with criminal histories and that "the three Ps," that is, "[finger]prints, … pics [photographs or videos], and phone records" failed to establish Petitioner's guilt. [See CR Doc. 148 at 22-25; see also CR Doc. 149 at 30 (arguing in closing that officers failed to conduct adequate fingerprint testing, and that no DNA report was introduced to show that Petitioner "touched and possessed" the guns that were seized)].

The Government presented evidence at trial including relevant portions of the recorded phone call[3] and recorded interview, video footage from Detective Newman's dashcam, and evidence seized from Petitioner's person, vehicle, and all three residences. Officer Bridges testified *inter alia* that he sees "minimizing" constantly during drug investigations as follows:

> Minimizing is when someone obviously possesses something they want to minimize their – I guess their exposure to that item when you interview.
>
> So say, for instance, if someone delivers three guns, they may say one. Or if someone delivers this weight, they might say less. Or they might say marijuana, instead of cocaine, to minimize their exposure to that item.

[Id. at 128]. Officer Bridges explained that he was not surprised to find nearly a kilogram of drugs at the Ravencroft residence because that amount was more consistent with the amount of money found in the Petitioner's vehicle when he was arrested, and with the street price for that amount of

---

[3] Officer Bridges testified that drug traffickers routinely use code words when speaking on the phone about drugs. [CR Doc. 148 at 69-71]. The Court found that the recorded phone call was admissible at trial, but Officer Bridges was not allowed to decode the phone conversation as an expert. [Id. at 4-6, 87].

drugs. [Id. at 128-29]. The Government addressed minimization in closing arguments as follows:

> I asked Mr. Bridges about minimization. How drug dealers will, sometimes when they know they're caught, admit to not everything. Yeah, I put my hand in the cookie jar but I only had two cookies. I didn't take six cookies. Not understanding that law enforcement is going to search the house. They will be thorough. This is a professional investigation. They had a tracker already on his car. They were already searching his phone, and then they go to the residences and what did they find?

> … We know also that when law enforcement searched Ravencroft, they find the roughly 753 grams of cocaine ….

[CR Doc. 149 at 9-11].

The jury found the Petitioner guilty of all of the counts but it found that the amount reasonably foreseeable by Petitioner in Count One was 100 grams or more. [CR Doc. 130]. In a Judgment entered on November 10, 2017, the Court sentenced Petitioner to a total of 420 months' imprisonment (60 months for Counts One, Five, Six, and Ten, concurrent, and 300 months for Count Nine, consecutive) followed by four years of supervised release. [CR Doc. 217].

On direct appeal, the Petitioner argued that: (1) under the Fourth Amendment, the Court erred by failing to suppress evidence gathered from the traffic stop that led to his arrest and subsequent incriminating statements; (2) under the Sixth Amendment's Confrontation Clause, the Court erred in admitting evidence relating to a phone call between Petitioner and an informant who did not testify at trial; (3) the Court erred in failing to merge his two § 924(c) firearm convictions for sentencing purposes; (4) Section 403 of the First Step Act should apply to lower the mandatory minimum sentence for the second § 924(c) conviction; and (5) counsel was ineffective for failing to challenge certain search warrants. The Fourth Circuit affirmed on March 3, 2020. United States v. Jordan, 952 F.3d 160 (4th Cir. 2020). It found that the claim of ineffective assistance of counsel claim should be raised, if at all, in a § 2255 motion because no conclusive evidence of ineffective assistance appeared on the face of the record, and found no error with regards to the other claims.

Id. The United States Supreme Court denied certiorari on January 11, 2021. Jordan v. United States, 141 S.Ct. 1051 (2021).

Petitioner filed the instant Motion to Vacate through counsel on January 11, 2022. [Doc. 1]. He argues that trial counsel was ineffective for failing to: (1) move to suppress evidence obtained pursuant to search warrants; (2) object to opinion testimony and argument that commented on Petitioner's credibility; (3) present exculpatory DNA evidence;[4] and (4) move to suppress Petitioner's custodial statements. [Doc. 1]. Petitioner seeks an evidentiary hearing and the vacatur of his convictions and sentences. [Id.]. The Government filed a Motion to Dismiss, arguing that Petitioner's claims are meritless and should be denied without an evidentiary hearing.[5] [Doc. 4]. Petitioner filed a Response [Doc. 5] and the Government filed a Reply [Doc. 8].

On December 12, 2022, Petitioner filed a Motion for Leave to Amend his Motion to Vacate so that he may raise a claim challenging the calculation of his guideline range. [Doc. 9]. The Government filed a Response arguing that the Motion to Amend should be denied because: it does not relate back to his original claims and is untimely; and it is futile because Petitioner's challenge to the Court's sentencing guideline calculation is not cognizable under § 2255. [Doc. 10]. Petitioner has not replied and the time to do so has expired. Having been fully briefed, these matters are ripe for consideration.

II.     STANDARD OF REVIEW

A federal prisoner claiming that his "sentence was imposed in violation of the Constitution

---

[4] In the Motion to Vacate, Petitioner argued that counsel was ineffective for failing to obtain the DNA report that would have established that Petitioner's DNA was not found on the firearm that was seized from his vehicle. [See Doc. 1-1 at 23-24]. In the Response to the Motion to Dismiss, however, Petitioner agreed that the report was timely provided to trial counsel. [See Doc. 5 at 9]. He now argues only that counsel was ineffective for failing to introduce the DNA report at trial. [Id.].

[5] The Government also argued that Petitioner failed to affirm his Motion to Vacate, however, it concedes in its Reply that any such error has been remedied. See [Doc. 8 at 1].

or the laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a).

Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that courts are to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings . . ." in order to determine whether the petitioner is entitled to any relief on the claims set forth therein. After examining the record in this matter, the Court finds that the argument presented by the Petitioner can be resolved based on the record and governing case law and that no evidentiary hearing is warranted. See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970). Accordingly, Petitioner's request for an evidentiary hearing is denied.

### III.    DISCUSSION

#### 1.  Motion to Vacate[6]

The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense. See U.S. Const. Amend. VI. To show ineffective assistance of counsel, Petitioner must first establish deficient performance by counsel and, second, that the deficient performance prejudiced him. See Strickland v. Washington, 466 U.S. 668, 687-88 (1984). The deficiency prong turns on whether "counsel's representation fell below an objective standard of reasonableness ... under prevailing professional norms." Id. at 688. A reviewing court "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." Harrington v. Richter, 562 U.S. 86, 104 (2011) (quoting Strickland, 466 U.S. at 689).

---

[6] Petitioner's claims have been reorganized and restated.

To establish prejudice, the petitioner must demonstrate there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. It is not sufficient to show the mere "'possibility of prejudice.'" Satcher v. Pruett, 126 F.3d 561, 572 (4th Cir. 1994) (quoting Murray v. Carrier, 477 U.S. 478, 494 (1986)). A petitioner "bears the burden of affirmatively proving prejudice." Bowie v. Branker, 512 F.3d 112, 120 (4th Cir. 2008). If the petitioner fails to meet this burden, a reviewing court need not even consider the performance prong. Strickland, 466 U.S. at 670. The Petitioner's claims of ineffective assistance are addressed in turn.

### A. Suppression

A "refined" version of the Strickland analysis applies when a petitioner claims ineffective assistance based on counsel's failure to file a suppression motion. United States v. Pressley, 990 F.3d 383, 388 (4th Cir. 2021) (quoting Grueninger v. Director, Va. Dep't of Corr., 813 F.3d 517, 524 (4th Cir. 2016)). The inquiry for the performance prong is whether the "unfiled motion would have had 'some substance.'" Id. at 524-25 (citing Tice v. Johnson, 647 F.3d 87, 104 (4th Cir. 2011)). If the motion would have had some substance, then the question is whether reasonable strategic reasons warranted not filing the motion. See id. at 529; Tice, 647 F.3d at 104-05. To satisfy the prejudice prong, the petitioner must show that: (1) "the [suppression] motion was meritorious and likely would have been granted, and (2) a reasonable probability that granting the motion would have affected the outcome of his trial." Grueninger, 813 F.3d at 525.

### i. Search Warrants

Petitioner argues that counsel should have moved to suppress the evidence obtained pursuant to the search warrants for his cell phone location data, vehicle tracker, and residences,

and requested a hearing pursuant to <u>Franks v. Delaware</u>, 438 U.S. 154 (1978), because the warrant applications contained material misstatements and omissions. [Doc. 1 at 4; Doc. 1-1 at 11-16]. Specifically, he argues that officers misrepresented the contents of the recorded phone call by inserting their own interpretations of its coded language; and that they omitted their conclusion that the CS was not reliable. [Doc. 1-1 at 11-16].

The purpose of <u>Franks</u> is to determine whether, but for the inclusion of intentional or reckless misstatements by the affiant, an affidavit would not support a finding of probable cause. <u>United States v. Clenney</u>, 631 F.3d 658, 663 (4th Cir. 2011). A defendant challenging the validity of a warrant is entitled to a hearing if he makes a preliminary showing that: "(1) the warrant affidavit contain[s] a 'deliberate falsehood' or statement made with 'reckless disregard for the truth' and (2) without the allegedly false statement, the warrant affidavit is not sufficient to support a finding of probable cause." <u>United States v. Fisher</u>, 711 F.3d 460, 468 (4th Cir. 2013) (quoting <u>Franks</u>, 438 U.S. at 155-56).

Petitioner's argument about the coded language fails because an affiant "cannot be expected to include every piece of information gathered in the course of the investigation." <u>United States v. Colkley</u>, 899 F.2d 297, 300 (4th Cir. 1990). Mere negligence in recording the facts relevant to a probable cause determination is not enough to show deliberate falsehood or reckless disregard for the truth. <u>Franks</u>, 438 U.S. at 171. Here, the warrant application reflects officers' reasonable interpretation of the coded language used during the phone call along with information gleaned from the circumstances of their investigation. Additional narrative including direct quotes from the recorded phone call, and the officers' thought process in drawing reasonable conclusions from that call, do not negate the existence of probable cause to track Petitioner's cell phone.

Nor did the omission of information about the CS's reliability negate probable cause. An

informant's "reliability is 'key' to a magistrate's probable cause analysis when the search warrant application contains information provided by an informant." United States v. Lull, 824 F.3d 109, 116 (4th Cir. 2016) (citing United States v. Wilhelm, 80 F.3d 116, 119 (4th Cir. 1996)). Resolving questions about a source's reliability requires an assessment of the totality of the circumstances with a particular focus on "the informant's 'veracity' or 'reliability' and his or her 'basis of knowledge.'" Wilhelm, 80 F.3d at 119 (quoting Illinois v. Gates, 462 U.S. 213, 233 (1983)). Another important consideration is whether officers have been able to corroborate the source's information. United States v. Hodge, 354 F.3d 305, 309 (4th Cir. 2004). But "[t]here is no set requirement that all tips be corroborated by subsequent police investigation in order to be considered credible." United States. v. DeQuasie, 373 F.3d 509, 519 (4th Cir. 2004) (quoting United States v. Blount, 123 F.3d 831, 836 (5th Cir. 1997) (en banc)).

Here, the evidence demonstrates that officers believed that the CS was cooperating at the time he provided information about "Zee" and placed the recorded phone call. It was not until after officers gained that information that the CS failed to remain in contact with officers, which ultimately led officers to conclude at some point after the recorded call that he was no longer being fully truthful and cooperating. Petitioner does not explain how the CS's discontinuation of his cooperation undermines the information that officers gained during his cooperation, including the recorded phone call. Nor does he explain how the CS's discontinuation of the cooperation tainted the evidence that officers learned during their subsequent investigation on which they relied to obtain search warrants for GPS tracking of the white truck and for searches of the three residences.

Petitioner has failed to demonstrate that he would have been granted a Franks hearing had counsel requested one, much less a reasonable probability that a motion to suppress based on the foregoing would have been granted and would have affected the outcome of trial. Accordingly,

Petitioner's challenges to counsel's failure to seek suppression of the warrants and the fruits of the investigation that followed, are denied.

### ii. Petitioner's Custodial Statements

Petitioner also argues that counsel should have moved to suppress his statements that were obtained during the custodial interview in violation of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). [Doc. 1 at 8].

A defendant is entitled to suppression of his incriminating statements if law enforcement officers failed to provide <u>Miranda</u> warnings during a "custodial interrogation." <u>See</u> <u>United States v. Giddins</u>, 858 F.3d 870, 879 (4th Cir. 2017). If the suspect effectively waives his right to counsel after receiving the <u>Miranda</u> warnings, law enforcement officers are free to question him. <u>Davis v. United States</u>, 512 U.S. 452 (1994) (citing <u>North Carolina v. Butler</u>, 441 U.S. 369, 372-376 (1979). If a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation. <u>Edwards v. Arizona</u>, 451 U.S. 477, 484-85 (1981). However, this request for counsel must be "unambiguous[]," that is, the suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." <u>Davis</u>, 512 U.S. at 459.

Here, Petitioner stated that he understood his <u>Miranda</u> rights, then answered the officers' questions for approximately 16 minutes at which point he suddenly said "I thought you said I can get a lawyer to talk to me." [<u>Id.</u> at 15:59:18-15:59-19]. This was not an unambiguous request for counsel. <u>Davis</u>, 512 U.S. at 459. Even if it were considered such, however, Petitioner has failed to identify any statement that he made after asking about counsel that was introduced at trial and, if it were suppressed, had a reasonable probability of affecting the trial outcome. <u>See</u> <u>United States</u>

v. Dyess, 730 F.3d 354, 359-60 (4th Cir. 2013) (vague and conclusory allegations in a § 2255 petition may be disposed of without further investigation by the court). Reasonable counsel could have concluded that seeking suppression of the interview would have been fruitless based on Petitioner's admissions that preceded his statement about counsel, and the other strong evidence of his guilt. Petitioner has failed to demonstrate prejudice for the same reasons. Petitioner's claim of ineffective assistance in this regard is, therefore, denied.

**B. Testimony Regarding "Minimization"**

Petitioner argues that counsel was ineffective for failing to object to Officer Bridges and Agent Billings' "expert" testimony about "minimization" because it improperly commented on Petitioner's credibility. [Doc. 1-1 at 20-22].

The Federal Rules of Evidence permits lay opinion testimony that is "rationally based on the witness's perception, helpful to clearly understanding the witness's testimony or to determining a fact in issue, and not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. A witness who has been qualified as an expert may offer opinion testimony under specified circumstances. Fed. R. Evid. 702. The Fourth Circuit has noted the "fine line" between lay opinion admissible under Rule 701 and expert opinion testimony that must comply with the strictures of Rule 702, finding that an expert must have some specialized knowledge or skill. United States v. Perkins, 470 F.3d 150, 155 (4th Cir. 2006). Further, "lay opinion testimony must be based on personal knowledge," while expert testimony may, but need not, be based on direct observation. Id. at 155-56.

Here, Officer Bridges and Agent Billings' testimony about minimization summarized findings and observations that they made regarding the investigation of the currency they found in Petitioner's vehicle, and the amount of drugs that they recovered from the Ravenscroft residence.

See generally United States v. Bennett, 738 F. App'x 140 (4th Cir. 2018) (finding that an officer's testimony that, in his experience, the simple fact that a vehicle is titled in a person's name does not by itself indicate that the vehicle belonged to that person, and that individuals involved in illegal activities try not to create a paper-trail of those activities, was permissible lay testimony summarizing the findings of his investigation). Reasonable counsel could have concluded that objecting would have been fruitless.

Even if counsel was deficient for failing to object, however, Petitioner cannot demonstrate prejudice because there is no reasonable probability that the testimony affected the verdict, in light of the extremely strong evidence of Petitioner's guilt including officers' observations of his activities, the evidence seized from his person and vehicle, his admissions, and the evidence seized from the three residences.

**C. Closing Argument Regarding "Minimization"**

Similarly, Petitioner argues that counsel was ineffective for failing to object to counsel's closing argument addressing "minimization." [Doc. 1-1 at 22].

The test for prosecutorial misconduct in the context of closing argument is "whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). A defendant alleging prosecutorial misconduct must show: "(1) the prosecutor's remarks or conduct were improper and (2) that such remarks or conduct prejudicially affected his substantial rights so as to deprive him of a fair trial." United States v. Caro, 597 F.3d 608, 624 (4th Cir. 2010).

Here, the prosecutor's closing argument addressing minimization asked the jury to draw a fair inference from admissible evidence presented at trial, and was not improper. See Section B

17

*supra;* see, e.g., United States v. Littlejohn, 802 F. App'x 760, 764-65 (4th Cir. 2020) (argument that a ski mask was Littlejohn's based on DNA evidence was not improper because it was a fair inference from the evidence).

Even if the argument about minimization exceeded the bounds of propriety, Petitioner cannot demonstrate prejudice because there is no reasonable probability that it affected the verdict in light of the extremely strong evidence of Petitioner's guilt. See Section B, *supra*.

### D. Exculpatory Evidence

Petitioner argues that counsel was ineffective for failing to present at trial a DNA report that would have shown that Petitioner did not possess the firearm that was found in his vehicle. [Doc. 5 at 9].

To support an ineffective assistance claim based on the failure to investigate, a petitioner must present specific information to show what favorable evidence the investigation would have produced. See Beaver v. Thompson, 93 F.3d 1186, 1195 (4th Cir. 1996). If there is "no reasonable probability that a possible defense would have succeeded at trial," counsel's failure to investigate such a defense is not prejudicial. Savino v. Murray, 82 F.3d 593, 599 (4th Cir. 1996). Decisions about what types of evidence to introduce "are ones of trial strategy, and attorneys have great latitude on where they can focus the jury's attention and what sort of mitigating evidence they can choose not to introduce." Pruett v. Thompson, 996 F.2d 1560, 1571 n.9 (4th Cir. 1993).

Petitioner's DNA claim fails because he has not identified any exculpatory evidence that reasonable counsel would have presented. The report shows that DNA testing on the firearm found in Petitioner's vehicle yielded inconclusive results. [Doc. 4-1]. Reasonable counsel could have decided to argue, as defense counsel did in Petitioner's case, that there was insufficient evidence of Petitioner's guilt. Because the DNA report was inconclusive, rather than exculpatory, counsel

18

cannot be deemed ineffective for failing to introduce it at trial. See, e.g., Penson v. United States, 1:19-cv-14-MR, 2019 WL 498852 at *4 (W.D.N.C. Feb. 8, 2019) (concluding that reasonable counsel was not ineffective for choosing to focus on the absence of DNA testing rather than on inconclusive DNA results which may have been damaging to the defense). Nor has Petitioner demonstrated a reasonable probability of a different outcome had counsel introduced the inconclusive DNA report at trial. Accordingly, this claim is denied.

### 2. Motion to Amend

Motions to vacate filed pursuant to 28 U.S.C. § 2255 are subject to a one-year statute of limitations, which runs from the latest of:

> (1) the date on which the judgment of conviction becomes final;
>
> (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
>
> (3) the date on which the right asserted was initially recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f).

An otherwise untimely claim relates back to the original timely-filed pleading if "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). The "original pleading" to which Rule 15 refers is the motion to vacate in a § 2255 proceeding. See Mayle v. Felix, 545 U.S. 644, 655 (2005) (discussing a habeas corpus petition pursuant to 28 U.S.C. § 2254). For the Court to find that an otherwise untimely claim relates back to the original timely filed petition, the amended claim must arise from a "common core of operative facts," and

19

may not be dependent on events that are separate both in time and in the substance of the facts upon which the original claims depended. Mayle, 545 U.S. at 664.

Here, the Petitioner's conviction became final for purposes of § 2255(f)(1) on January 11, 2021, when the United States Supreme Court denied certiorari. See Clay v. United States, 537 U.S. 522, 524-25 (2003). The Petitioner therefore had one year from January 11, 2021 to file a motion to vacate. The instant Motion to Amend was filed 11 months late on December 12, 2022. The present sentencing claim does not relate back to the timely-filed claims of ineffective assistance of counsel. Accordingly, the Motion to Amend is untimely under § 2255(f)(1), and Petitioner has failed to show that the Motion should be considered timely under any other theory. The Motion to Amend is, therefore, time-barred.

Even if the Motion to Amend were timely filed, it would be denied as futile. A sentencing error is not cognizable on § 2255 review unless it is constitutional, jurisdictional, or amounts to a "fundamental defect which inherently results in a complete miscarriage of justice." Davis v. United States, 417 U.S. 333, 346 (1974). Barring "extraordinary circumstances, ... an error in the application of the Sentencing Guidelines cannot be raised in a § 2255 proceeding." United States v. Pregent, 190 F.3d 279, 283-84 (4th Cir. 1999); United States v. Mikalajunas, 186 F.3d 490, 495-96 (4th Cir. 1999) ("misapplication of the [sentencing] guidelines typically does not constitute a miscarriage of justice."). This includes a career offender designation that is applied under an advisory guideline scheme. See United States v. Foote, 784 F.3d 931, 936 (4th Cir. 2015). Because Petitioner seeks to raise a sentencing guideline calculation error and no extraordinary circumstances are present, Petitioner's claim is not cognizable on § 2255 review. Accordingly, the Motion to Amend will be denied.

**IV. CONCLUSION**

For the foregoing reasons, the Government's Motion to Dismiss is granted, Petitioner's §
2255 Motion to Vacate is dismissed and denied, and Petitioner's Motion to Amend is denied..

**IT IS, THEREFORE, ORDERED** that:

1.      The Government's Motion to Dismiss [Doc. 4] is **GRANTED**.

2.      Petitioner's § 2255 Motion to Vacate [Doc. 1] is **DISMISSED** and **DENIED**.

3.      Petitioner's Motion to Amend [Doc. 9] is **DENIED**.

4.      **IT IS FURTHER ORDERED** that pursuant to Rule 11(a) of the Rules Governing
Section 2254 and Section 2255 Cases, this Court declines to issue a certificate of
appealability.  See 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 338
(2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable
jurists would find the district court's assessment of the constitutional claims
debatable or wrong); Slack v. McDaniel, 529 U.S. 473, 484 (2000) (when relief is
denied on procedural grounds, a petitioner must establish both that the dispositive
procedural ruling is debatable and that the petition states a debatable claim of the
denial of a constitutional right).

5.      The Clerk is respectfully instructed to close this case.

Signed: February 28, 2024

Robert J. Conrad, Jr.
United States District Judge

21